BERNARDO LANDIN *v.* THE STATE.

THEFT — INTENT.— Not only must there be a taking of the property of another without his consent, but the mind must intend a fraudulent taking with intent to defraud the owner of the value thereof; otherwise the offense of theft is not made out. Note the facts of this case in illustration.

APPEAL from the District Court of Webb. Tried below before the HON. J. C. RUSSELL.

The appellant was indicted for the theft, in Webb county, on or about the 6th day of May, 1880, of one steer, the property of one Peter Steffian. His trial resulted in conviction, with two years' confinement in the penitentiary assessed as his punishment.

Vicente Flores, inspector of hides and animals of Webb county, testified for the State that early on the morning of May 9, 1880, with the sheriff and posse he arrived at the ranche of defendant's mother, and saw her and two of her sons, brothers of the defendant, and also an old man named B. Martinez. He saw some of the meat of an animal killed some three or four days before, part of it being in the house and part hanging out under a shed. He found a pair of bovine ears lying between the timbers of the fence, some four or five yards from the house. The defendant's mother told witness, at the time, that these were the ears of an animal that they had killed at the ranche. These ears bore the ear-mark of P. Steffian. Macedonio, defendant's brother, showed the witness the hide of the animal, which was cut in strips and pieces,— some made into long strips for tying yokes to the horns of cattle, and some into long, thin strips, such as are used by the Mexicans for thatching jacals. These pieces were about forty yards from the house, in the field, near an old dry·lagoon. The portion of the hide that bore the brand had not been cut, but was entire, and was secured

by the witness. It was Steffian's brand. The sheriff arrested Macedonio, the defendant's brother, who was brought to town by the witness and two rangers. The defendant's mother told the witness at the ranche that she had sent her eldest son, the defendant, to bring in a beef for slaughter, as they were out of meat, intending to pay the owner, whomsoever he might prove to be,— that they did not know to whom the animal belonged when first brought in, but learned afterwards that the brand was that of Peter Steffian.

Cross-examined, the witness stated that the defendant was at no time present during the conference at the ranche. No part of the meat was concealed, but lay openly in the jacal on a table. The mother cooked some of it for the party and they breakfasted on it. She owns and controls the ranche, which is situated about eight leagues distant from Laredo, and defendant lives with her. No one of the family made any denial or concealment of the killing of the animal, or of any part of the meat.

B. Martinez, for the State, testified that the beef in question was brought to the ranche by the defendant about three or four o'clock, P. M., and slaughtered at about nightfall of the same day, by himself, witness, the defendant and his brother Macedonio. The mother sent defendant and her younger son, Simon, to drive up a beef belonging to anyone, as they were entirely out of meat, saying that they would pay the owner for the animal. The defendant brought in the animal, and said he drove it from the Cerrito. It was killed openly, where it was tied up, within fifteen yards of the public road. When he first drove up the animal the defendant said that he did not know who owned it, but, upon examining the brand before killing it, he said that it belonged to Peter Steffian. The hide was staked and stretched out at the same spot until next day, when it was cut into strips to tie the rafters of a jacal they were building on the

ranche. The defendant then took them into a field to put them into a lagoon, but finding it dried up, he threw them down, and said he would leave them there until he returned from Laredo, when he would take them to the arroyo. On Friday the defendant took some meat to the ranche of Las Tiendas. On Saturday he started to town, and said to witness that he was going for the purpose of paying Steffian for the beef. On Sunday witness was brought to town by the sheriff as a witness. The defendant's mother sent portions of the meat to all the neighbors living in the vicinity. The ears were cut off, and defendant directed his brother to put them on the fence that they might be preserved to identify the ownership; which he did, but they subsequently fell to the ground, where they were found. Flores, the first witness, was corroborated by Dario Gonzales, sheriff, who testified also that he learned the facts from Martinez as stated by the latter on the trial. He first got the ears from Flores.

By the records of marks and brands of Webb county, and by the owner, the property was proved to be that of P. Steffian. Steffian testified further that he had never given defendant authority to kill any of his cattle.

The substance of the testimony of the defendant's mother and his brother Macedonio was that, the family being out of anything to eat, the mother despatched the defendant and a younger brother, on Thursday, to drive up a beef to slaughter, saying she would pay the owner, whoever he might prove to be. Accordingly the animal in question was driven up openly, and openly slaughtered within fifteen steps of the public road. When first driven to the house they were ignorant of the owner of the animal, and the mother sent her son to her neighbor, Pascual Arcia, requesting him to come and see if he could recognize the animal. He did not arrive before the animal was killed, and a copy of the brand and ears were secured and kept by the mother. When Arcia subsequently arrived

the copy of the brand was shown to him and he pro-nounced it that of Steffian. The ears, it was testified by mother and son, were preserved by the mother in the house, and by her were delivered to Sheriff Gonzales. The defendant, on Saturday, was sent by the mother to town to pay Steffian. The mother owned a flock of sheep and goats and some cows and calves, but they were herded out by contract. The mother testified further, that, after the arrest of defendant, she went to Steffian and offered to pay for the animal, but he refused to accept pay. She had long dealt with Steffian, obtaining credit at his store often, and had always been willing, ready and able to pay for the steer.

Pascual Arcia testified that he received a message from the defendant's mother to go to her ranche to identify a steer; that he did not arrive before the killing, but afterwards was shown by the mother a brand on a paper, and he told her it was Steffian's brand. This was on May 26.

Pedro Martinez testified, for the defense, that he was at the ranche of defendant's mother on the 5th of May, about nightfall, and found defendant and others dressing a yellow beef steer. He did not examine the brand, but was then told that it was Steffian's steer.

Bruni, a deputy sheriff, testified that he arrested defendant about noon on Sunday, May 9, at his mother's house in Laredo, while in bed asleep. He had come to town during the day or night previous, and had no money about his person.

No brief for the appellant has reached the hands of the reporters.

*Thos. Ball*, Assistant Attorney General, for the State.

Hurt, J. The appellant was convicted of theft of a steer. The charge of the court is a full, fair and pointed application of the law to every phase of the case as made

by the facts. The trial, judging from the record, was in every particular legal, and eminently fair to the appellant.

There remains but one question: Does the evidence support the verdict? We think not. The fraudulent intent is wanting. Criminal jurisprudence differs more from civil concerning *intent* than upon any other point. If one does an act injurious to another, though not influenced by an evil mind nor intending the same, he shall be held the loser, rather than the other, under many circumstances in which no blame can be attached. Not so in criminal law, for crime proceeds only from a criminal mind; and especially is this the case with regard to theft. "There is but one criterion by which the guilt of men is to be tested. It is whether the mind is criminal. Criminal law relates only to crime, and neither in philosophical speculation nor in religious or moral sentiment would any people in any age allow that a man should be deemed guilty unless his mind was so. It is therefore a principle of our legal system, as probably it is of every other, that the *essence* of an offense is the wrongful *intent*, without which it cannot exist." 1 Bish. Crim. Law, 370.

To constitute theft there must not only be a taking of the property of another without his consent, but the mind must intend a fraudulent taking with intent to defraud the owner of the value of the property.

The statement of facts will be reported, and from the facts it will be seen that (giving the evidence all of its strength and viewing it in the most unfavorable light to the appellant) there is no proof even tending to show a fraudulent intent; but, on the other hand, every fact, save the taking of another's property without his consent, refutes it completely. We therefore conclude that the court below erred in overruling the motion for a new trial; for which error the judgment is reversed and the cause remanded.

*Reversed and remanded.*